Elaine, and I'm going to ask counsel to correct me when they get there, Ajaipour v. Northern Leasing. Thank you. Good morning, Your Honors. And before I begin, I just want to point out to the Court, I'm severely visually disabled, and I can't see any of you, so I may not be able to realize who is speaking. I'll do my best, but it just may not happen. And it's Ajaipour. Ajaipour. Thank you. I appreciate that. Good morning, Your Honors. My name is Keith Altman. May it please the Court. We have a case here where we're dealing with a company, a defendant who was involved in a national fraudulent scheme. And if there was any question about that, the New York Attorney General brought an action against this company to have them dissolved for committing fraud on the New York City civil courts. And after substantial argument, documentation, the judge found that there was a pattern of fraudulent activity and made a very detailed, specific finding of exactly how the fraud was conducted, that it involved tens of thousands of people, including the clients in this particular case. And this is going to be important, because these findings are not really for some other case. They address these particular plaintiffs. Now, the jury, during the trial, we went through an entire trial, the jury was presented with a verdict form. It wasn't just simply, do you find them responsible for RICO? Do you find them responsible for a conspiracy for RICO? Every single element of every one of the causes of action were specifically asked of the jury for them to provide a response. Was there an enterprise? Yes, no. Was there a pattern of racketeering activity? Yes, no. So this is not just simply some, you know, a jury who hears a bunch of facts and they just make a decision. This was very carefully created, and I can tell you, Your Honor, I mean, this was about a 12-day trial. This was not a quick trial. I remember our jury instruction conferences. We spent several hours going over the jury form. This was very carefully considered by the Court. Now, one of the essential elements here that's incredibly important, nobody from the defendants ever came to court with any personal knowledge that my clients had signed these lease agreements because nobody from the company was there. They used a third-party organization, and this is very much a part of the findings by the New York, you know, the New York Attorney General case. They used a third party to get these contracts supposedly executed. At no time did anybody from the defendants come to the court to talk about that they observed these clients signed these documents. The original signed lease was never produced, never shown. So there was no evidence ever presented by the defendants that there's a wet signature on a document. Now, the plaintiffs were specifically asked, did you sign this document? And the answer unequivocally was no. There was no question about it. They were asked, does it look like your signature? Yes, it does. Can you explain how it got on there? No, I can't. One clear way that could have led to the signatures being on page is by cutting and pasting an electronic document. I mean, it was well established at the time that that could be done. I've been dealing with that since before 2000. But no evidence whatsoever was ever presented by the defendants to show that these people had actually signed that document. The line between the absence of evidence and the legal doctrine that we need to be mindful of, that bald assertions of forgery are insufficient, I think is a little bit murky. So can you tell me why? You clearly think that this is not a bald assertion, but I'm hearing the absence of contrary evidence. If you could tell me how we should understand those two principles together. Well, all I'm saying is, is that the plaintiffs definitively, unequivocally testified, I never signed that document. I never saw that document. Okay, so we have that testimony. So it's not the same thing as saying that was forged. It was, I never did it, and that takes it out of the realm of being an assertion of forgery? No, that's not what I'm saying. Okay, I do want to understand it. It's not supposed to be a hostile question. I'm trying to understand two things that I don't think fit neatly together. I understand. But combine that with the absolute lack of any knowledge by the defendants because they weren't even involved in getting the execution of that signature, which is a huge problem here. It's not like they brought the independent third company who can say, yeah, I was there, they signed this document. It's not like they even know how that person obtained the signature. It's not like they even know how that person maintained the signature. So, again, I started off, so we have, you don't, I'm sure, I'm assuming you don't dispute that the law says that we can't, that bald assertions of forgery is not enough. You agree that there's law that says that. Is that right? Yes. But now combine. On the other side, then, I have you saying, but they didn't have evidence to the contrary. So is that, how should we understand what your burden is in this case, given the existence of the law that says an assertion of forgery is not enough? But you can't, you can't ignore the fact that there is also a finding in a separate matter that there is fraud and forgery of tens of thousands of people associated with a scheme, that this company was part of a scheme that is, was well-established, and there are judicial findings, and one of our bases of appeal is those findings were excluded. They should have been included in the, they should have been included under 404B. They certainly directly address that there was a pattern of fraud and forgery against my clients. Can I focus on that a little bit? As I understand it, under the New York law, the finding of fraud, and fraud gets defined in different ways in different contexts. Under the New York law, they had to show that Northern Leasing engaged in acts that tend to deceive or create an environment conducive to fraud. Is it your view that satisfying that standard would be dispositive of the fraud-based claims that you've made here? No, I think it, I wouldn't say it's dispositive, but I say it's certainly sufficient information that a reasonable jury could have considered. Further, you know, they found in our favor on almost every question was answered yes. So let me, let me drill down on that because that's helpful. I was trying to understand your argument about the New York case, and most of your arguments sounded as though it was challenging the evidentiary ruling by the district court, in which case we would rule it, evaluate it under the standards applicable to an evidentiary ruling. There was a, there were times when it seemed like you might be arguing that there was some sort of issue preclusion as a matter of law, not going to an evidentiary ruling, but going to the, I guess, legal existence of issue preclusion. Are you arguing that second thing, or are you only? In part, yes, Your Honor, because there were findings very specific in that case that basically the court concluded there was a pattern of fraudulent activity. Right. Defined, the fraudulent activity was defined under this creating activity conducive to fraud definition, wasn't it? Yes, Your Honor. I'm not sure I'm understanding the New York decision. This was, okay. The ultimate New York decision was whether there was fraud on the court. Okay. That's ultimately what the New York attorney general's action was based upon. Was this company committing fraud on the court? And ultimately it found that there was. But leading up to that very last element of that, the court made numerous findings of facts which were exactly relevant to this case, that they were filing lawsuits. And keep in mind, my clients, they had filed lawsuits against my clients, is ultimately how this, our case, came to be, is because of the lawsuits they filed. And so there was a detailed finding of the evidence that had been collected and conclusions of fact based upon those elements.  But am I misremembering the New York case? I thought they specifically said there's not actually evidence that Northern Leasing knew that the contractors who were getting these contracts had forged them, if in fact they had. So it didn't actually hold Northern Leasing liable for fraud on that basis. Instead, it relied on this broader conducive to fraud. Am I misremembering that that was the court's reasoning? No, I think you're correct in that they didn't say that we conclude every one of these agreements are forged or fraudulently obtained. I agree with that. But the whole pattern of the conduct, remember, at the end of the day, the real question was about the lawsuits that were brought against my clients, the actions that the company brought against my clients. Because of the actions that were brought against my clients, Elaine Agarpoor had to shut down her business. Right. But this isn't a defense to those cases. This is an affirmative suit claiming that that was fraudulent. Now, you've made a compelling argument as to why there was sufficient evidence to conclude that these documents contained forged signatures. Don't you also have to prove or didn't you also have to prove to the jury that Northern Leasing and its affiliates knew that they were forged or did the forgeries themselves? Because I think your theory was that these contractors were the ones who actually did the cutting and pasting, right? And the clients, both of them, told Northern Leasing, I never signed this lease agreement. Okay. But one of them, Northern Leasing, said, okay, great. Let me send you a form to fill out to attest under oath that you didn't sign that. And she said, no, I'm not going to sign it. You know, Your Honor, that may very well be true. But that doesn't change the fact that what did Northern Leasing do to verify the signatures? Why did that become a unique burden to my clients? Why didn't Northern Leasing have a burden, which they say they never did? Why didn't Northern Leasing have a burden to get with the person who supposedly got that contract executed and say, hey, we got a client who's questioning whether they signed this document. What do you have? They didn't do anything. They admit they didn't do anything. So you sued eight different defendants, Northern and BF Leasing, Lease Finance Group, Mr. Cucinato, Mr. Cohen, Ms. Cianento, Ms. Krieger, Ms. Hussman. Is your evidence as to their knowledge about the specific intent crimes, right, knowing that the leases were forged and their recall claims of wire and mail fraud, is your evidence as to their knowledge and intent to deceive drawn entirely then from your clients' disavowal of their signatures and the New York State case as to each of those eight defendants? No. For example, with Mr. Cucinato, Mr. Cucinato did the verifications on the lawsuits that were filed in the New York City Civil Court. Mr. Cucinato testified he didn't do anything to verify the facts of those lawsuits. He just simply signed them. It was part of his job, just sign the lawsuit. So did that itself then was evidence of fraudulent intent? It's part of it because that's where you get into the RICO aspect of it. Okay. And this was another issue with the Court. The Court, I believe, got it dead wrong. Not every member of a RICO conspiracy and enterprise is required to commit at least two acts. They have to be part of the enterprise, and the enterprise has to have committed more than two acts, not each person who's part of the enterprise. Now, Mr. Cucinato was well aware that there were lots of complaints about fraud and forgeries, and Mr. Cucinato, knowing that, never did anything to verify a complaint that he signed that would be filed with the New York City Civil Court. That's direct testimony. And the other woman, I'm sorry, I just can't remember her name, not Ms. Prieger, but the other woman who testified who was in a similar capacity, she also did nothing to verify any of the facts of the complaint. Was that enough to demonstrate fraud, a fraudulent intent? When you're talking about fraudulently bringing lawsuits, yes, because that's what this is about. This is not about fraud in the general. This is about a company that is using the New York City Civil Courts to extract tribute from these people. I mean, it's a $2,500 lease for a piece of equipment that retails for $250. That's not before Your Honors. But to defend that lawsuit, the defendants slip in a section called About Your Bank, that you agree to New York City Civil Court jurisdiction, and you agree to service by mail, and basically lowing past all the normal due process rights that a defendant would have. And why do they do this? They do this because they know somebody from California like Ms. Agarpour or somebody like Ms. Norris from, you know, somebody like Ms. Norris from Texas, they're not going to spend the kind of money that would be required to defend themselves. I mean, this was – I've never seen this before. In the New York City Civil Court, they had their own special part just for northern leasing cases. And I know this because I used to come in about once a month. I would fly in and deal with these matters. But, again, we have to focus on what was presented to the jury here. And what was presented to the jury, what was presented to the jury was evidence from the clients that said, I never signed these documents. Okay? We start off on that side. The evidence that was also presented, they made credit inquiries, which I never agreed that they could do. They were called multiple times. They were mailed multiple times trying to collect these things. There was clear-cut evidence from the – Somebody forged my signature, right?  And then the rest are – they were trying to enforce the lease? No. You ran my credit without my consent. And the leases don't permit that? They don't because the lease is a business. These are business leases. These are not personal leases. And these people are listed as personal guarantors, which ties into the – to the GBL-349 claim. That GBL-349 claim is not – you know, there was a business signed the lease, allegedly, and then there's a personal guarantor. And they did not run credit against the businesses. They only – before they executed the lease, they only ran credit. Okay. So my signature was forged, they ran their credit, and then – They ran their credit without their consent. Then when they didn't get paid, they called them many times. They mailed them many times. Except the fact that they called because the company didn't think it was forged, presumably, and they thought it was – and they want to enforce the lease is now evidence that it was forged? No, but they continued – I'm just trying to figure out what we do about that fact because right now you've given me three. Okay, but they – And I don't understand the relevance or what we're supposed to infer from the third. That's the mail fraud. And the wire fraud. Because after it was made known to them that these leases were not signed, they continued calling them anyway. They continued mailing them anyway. Okay. And they did nothing to – Wait a minute, but Ms. Agipor said that she didn't sign it, but Ms. Norris didn't, right? No, Ms. Norris also testified she never signed the lease. No, no, no, but she didn't tell them that it was forged, right? Like Ms. Agipor testified that she did, but Ms. Norris didn't. I don't think Ms. Norris knew about it until – Well, then how could it have been – then why would it have been weird to be following up with them by calling or sending the mail? I mean, I think at some point she did tell them, and they did know, and they continued pursuing the lawsuit anyway. So you're talking about Ms. Norris now? I'm sorry? So what's confusing me is Ms. Norris reaches out, says, I didn't sign that. They say, here's a form, sign it under oath, saying you didn't sign it, and then we'll presumably take whatever steps we take when there's an allegation of forgery. She didn't send it back. And so I take it your view is that when somebody calls a company and says, I didn't really sign that, even if they're not willing to say that under oath, the company is presumed to have fraudulent intent if it continues to treat that document as if it was legitimately signed. Okay. Your Honor, you have to look at this in the context of a company that has tens of thousands of these kinds of complaints. These are not stray issues like, we don't get these tens – I think they filed something – got something like 30,000 defaults. You're talking about a company that is well on notice that there is an issue. You're talking about a company that knows. And, you know, this is, you know, a document that wasn't allowed to be admitted, but it was a company who knew that the ISOs, the people who were getting signatures, were committing fraud. The top sales guy is talking to somebody else in the company about, hey, we know these merchants are stupid, and stupid people get burned. And that's not really before you guys, but this is a company who was well on notice. I've been litigating against this company on this very issue since 2008. It's the first case I ever started working on. I've been with these guys a long time. One of the cases that I'm still working on is 20 years old. It's still going on. But the point is, this is not an isolated one person saying that, you know, an isolated one person saying that I didn't sign this document. This is a consistent practice that the company was well aware of. They knew full well that these ISOs, that's what they call their people who would get signatures, they knew that there was a consistent problem of these ISOs engaging in bad practices. I'm 99% sure that one of their big problem children was the person who got the signature for, I think it's Ms. Agarpour. So they knew that there was a problem with this particular ISO. And that's something that the Court has to look at here. It's in the total context. Okay. Okay. I think we have your argument well in hand, so thank you. We'll have an opportunity to hear from you again in rebuttal. Thank you, Your Honor. Attorney Parnas. Thank you. May it please the Court, my name is Hillel Parnas. I represent the defendants' appellees. As you can imagine, I have a lot of things I want to say, and I'm going to try to organize my thoughts properly. But the first thing is, I think it's clear that an opposing counsel has been dealing with these cases for a long time. But what he continues to do are the very things that Judge Roman admonished him from doing, which is talking about things that are not in evidence, that he specifically excluded from evidence, and failing to understand the burden of proof. And it all ties together. The New York Attorney General decision was the subject of a motion in limine. At ECF-203, in the case below, we filed four motions in limine. The judge granted three out of four. And one of them specifically was to exclude the New York Attorney General case decision. And there were at least five different reasons why that got excluded, including the one you were talking about before, which is Section 6312, under which the Attorney General can bring these cases, is a completely different standard than the kind of standard that opposing counsel here would have had to meet in front of the jury. The judge very specifically said the opinion is out, the opinion cannot go to the jury. He rejected a later application to take judicial notice of it. He said two facts were allowed to come in, the fact that 30,000 lawsuits had been filed and 19,000 defaults had been obtained. But time and again, he kept telling opposing counsel, you cannot talk about the legal conclusions. You can't talk about the fraud. And from the beginning all the way through closing, opposing counsel continued to step on that decision, continued to say things to the jury about this very opinion, things he was not allowed to say. And that's because, as I think Your Honor is intuited, from the beginning he thought he could win this case by having the jury hear what the judge in the Attorney General's case had found. In the motion that ---- It sounds like he won this case without that. So the jury must have found the evidence that it did hear from Fallon. Well, so let's go to that. So the first thing is, and again, I'm not arguing this part here, I tried to get ---- I don't know if you read the entire transcript, but even reading the portions, you will see time and again when he did talk about the Attorney General's decision or legal conclusions that had come from it, so those were in front of the jury. He also just mentioned a moment ago an e-mail about suckering. That was also specifically excluded from evidence on a different motion eliminated, as motion eliminated number four. That was not allowed to go to the jury. Most of what Mr. Altman was just talking about were facts that were not in evidence, including the fact that he has said at trial, and I had it stricken, and he said it again here, that his two clients were part of the lawsuits at issue in the Attorney General's case. Those are not facts in evidence. They were not facts in evidence there. He should not be talking about them here. We come back to first principles, though. And the first principle that I think he started off talking about is, as Judge Roman said, this entire case depends on whether he has proved that these leases are fraudulent. Another one of my motions eliminated, the one I lost, was to exclude testimony from these two plaintiffs about whether the leases are fraudulent. I lost that motion because the judge said you can have layperson testimony about handwriting, which is true. But all they testified was, I didn't sign that. And then you have the quotes in the brief, you have it in the judge's decision. All they had was speculation about how the signatures had gotten on there, one of them speculating that it was from a DHL receipt that she didn't have, and the other speculating that it came from a check. And even when I pointed out to her that the check was from 2008 and the lease was from 2007, she stuck to her guns, saying it must have come from the 2008 check put onto the 2007 lease. But it was all speculative. And the speculation — Well, do we have a what signature that we could look at and say, oh, yeah, that clearly isn't testimony that could be credited? We do not. We do not. And our point here is, again, counsel continues to try to flip the burden of proof. We don't have a burden of proof of defense. They have a burden of proof to prove fraud. And fraud is — Can I just go back to the what signature thing? Sure. I thought you were going to say that the presence or absence of a what signature doesn't matter because they're not disputing that it's their signature, and what they're actually saying is that they weren't the ones that put it, and they have a theory of cutting and pasting. Is that right, or does the what signature — No, I would agree with that as well. And we even brought out during testimony that even if you had the what signature there, it still wouldn't prove who signed it. Right? It might prove it wasn't a literal cut and paste, but it wouldn't prove that it wasn't a forgery. So we made that point as well. But, again, coming at it from a defensive standpoint, but from a plaintiff's burden of proof standpoint, yes, they should say I didn't sign that, but then you need to bring forward some evidence of the forgery and then evidence of knowledge and evidence of agency. And that's the other part that goes into this. Well, I think your colleague would say that in addition to their testimony saying I didn't do it, there was also the backdrop of 30,000 or 19,000 other people saying that they didn't do it, and together that was enough for the jury. I think that was what the argument was making. Is that wrong? Well, the 30,000 and the 19,000, those numbers were allowed to be told to the jury. The substance behind it was not allowed to be told to the jury regardless. And the lawsuit here was not about the 30,000 lawsuits, not about the 19,000 defaults. It was whether fraud occurred here. And for fraud to occur here, as I think Your Honor was pointing out, especially for RICO, you need to have an affirmative intent to commit these violations. You have to have an affirmative scheme. We've briefed, by the way, in our brief, Mr. Altman is incorrect about the two predicate act point. I've given you cases. I don't believe they've cited any cases to the contrary. But I've cited multiple Second Circuit cases, starting with DeFalco, that say you need two predicate acts by each person that you want to wrap up in this. As was pointed out, there are three corporate entities. One of them was voluntarily let out right before the closings, I think, and five individuals. And there's absolutely no evidence of any of the individuals mailing anything to these plaintiffs. There's no evidence of any of these individuals using the wires with respect to these plaintiffs. There's no basis for any of the predicate acts. And that, again, assumes we even get to the scheme, which would require some kind of knowledge or agency of what was going on. As Judge Roman pointed out, this scheme wouldn't make sense if the entire ‑‑ if the scheme was to fabricate everything to try to drag people into New York Civil Court. What he said was the only way that the scheme would make sense in the context of what was presented was that you have a legitimate business. You're relying on these independent contractors. And, by the way, the only evidence in the record is a document, a contract that specifically said there were independent contractors, that you have these independent contractors out there getting signatures, and that sometimes when they can't get a signature, the contractor fakes the signature, right, to supplement the rest of your business. And then you follow with the procedures you were talking about. Let me ask just about an ancillary matter to the whole scheme that has been described.  There are state law claims under 38BB about requesting a consumer report. Without providing notice, and this is part of harassing behavior that has been posited and was presented to the jury. Ms. Norris testified directly that the defendants had pulled her credit report at least half a dozen times and hadn't given her notice. And I didn't see any rebuttal testimony about that. Is that a contested fact? Is that a ‑‑ even though it's a minor matter, is that unrefuted and undisputed? Well, let's begin with the fact that there was no evidence other than generalized testimony that I got a lot of phone calls, I got a lot of mailings, my credit was pulled. Not a single document was put in on the plaintiff's side to substantiate any of that. No documentary evidence of any phone calls. No details as to dates or times or anything of phone calls. No copies of all these mailings they allegedly got. And likewise with the credit report, no evidence was put in about any of that. So it was all highly generalized, and when I crossed them on it, they had no details on it. That being said, as Judge Roman correctly concluded, if the leases are valid, then you're allowed to pull credit reports. If the leases are valid, you're allowed to report to the credit agencies. He also pointed out, and even he said he didn't need it to come to the conclusion he did, even if all that is wrong, the damages are not there either. The only damages they testified about was annoyance without quantifying what the annoyance was. So I hope that addressed that question there. But the bottom line is it is all, at the end of the day, dependent on the validity of the leases. There was one more point that was made. Can I follow up on that before you go to the other topic? Sure. Because I was struggling with that a little bit. So under the New York law, if you have a legitimate purpose, you don't also need consent to pull the leases? Or is the theory that the consent was reflected in the leases, and so that they can't be held liable? I guess it's a negligence standard there. Their willful claim was dropped. They can't be liable for negligence on that because they had no reason to know it wasn't really her signature? I don't want to misstate because I didn't think about it as deeply as you did, Your Honor. So I don't know the exact answer. I'm sure it's not. I don't know the answer to that exact question there, Your Honor. I do believe my instinct is that we're relying on the leases themselves as allowing you to pull the credit. He just said that it didn't. I asked that question, and he said that it didn't. So it might be worth your colleague on the other side pulling the part from the lease where he thinks it establishes, because you say no and he just, when he was up here, said yes. I'm sorry. You said it is, and he said no. Right. But I do believe at the end of the day what Judge Roman, and, again, we are here to challenge his decision or to defend his decision. His conclusions were that everything that was done, if the lease is valid or you have no reason to doubt it or no reason to be responsible for any alleged forgery, everything that flows from that would have been fine.  But I'm trying to figure out whether that's right. I'm trying to figure out whether, especially the state fair credit claim, requires the knowledge of the forgery in the way that the other claims do. Yeah. I will try to figure that out while I sit there, Your Honor. I can't promise that I will. There was one more point that my colleague brought up that I want to make sure. It fits in the same first category of things that were excluded. One of his arguments that he made at trial, that he's made again here, is that we weren't allowed to pull the credit reports. My clients weren't allowed to pull credit reports on these individuals. They were only allowed to pull them on the businesses. In both of these situations, the individuals were operating, doing business as DBA entities. There were no legal entities involved. So as, again, it kept getting brought up at trial, and you'll see it in the transcripts, and I cite to it in my brief. I can get you the cite if you need it. But the district court repeatedly admonished that you can't, that that's an incorrect legal principle to say that when somebody's operating as a DBA, there's a separate legal entity. There is no separate legal entity, and therefore that entire argument, to the point that after several of the admonishments, the judge actually, I believe, had to instruct the jury to disregard what they said about that. If I may, before you sit down.  Did the district court understand our current law as to how one shows a RICO enterprise? There was a citation to first capital asset management, which I understand is having a different standard than what our current law is. Is that right? You're asking whether the court was relying on first capital asset management? Well, I'm asking if the court's RICO analysis, in your view, properly considered our current law on what an enterprise is, and if it did or didn't, does it matter? I believe, if I'm remembering correctly, when we had a oral argument about this, the judge acknowledged that any group of people can be an enterprise, but that enterprise then has to be acting in concert toward a specific goal, and that goal has to be an improper goal. So if we've had case law since then that say, no, it just has to be a common goal, it doesn't have to be a fraudulent goal, it can be a legitimate enterprise that creates the enterprise, does that change your argument at all? Does it undermine your defense? I don't think it does because, again, we still have the complete lack of predicate acts. The predicate acts were specifically identified by the plaintiffs, and those made their way directly into the jury instructions verbatim as to what each person was alleged to have done. And on the predicate act issue, if I could, I'd like to give you the exact. So on page 36 of my brief is where we talk about this, and the main Second Circuit cases are DeFalco, Apollon, and Mills, all of which say you need two predicate acts by each person you want to hold responsible for RICO. So certainly when it comes to the individuals, and I also detail in my brief how there was no evidence of that. You'd have to detail with the individuals, each one, how they each committed two predicate acts, and you'd also have to do it for the corporations. But in your view, nobody committed any predicate acts because there's no evidence that anybody had the necessary fraudulent intent. Am I understanding your argument? Absolutely correct. This is just kind of a fallback argument. Well, it's fallback, but it's also important because if they didn't send out any mailings, right, you can look at it both ways. If you think these leases are fraudulent, right, but Mr. Kuchinada didn't send out any mailings or use the phone, right, then there's nothing there. Thank you. Thank you very much. Attorney Alderman. So a couple of things to address your question. The lease had a specific section called personal guarantor. In the personal guarantor section, that's where the person who was supposedly guaranteeing the lease would sign up, and that's where it said that you're giving this consent to pull your credit. So that's where that comes from. Do they need consent under the New York law if they are a business transaction involving a consumer where the user has a legitimate business need for such information? Is that an alternative to consent, or is consent required regardless of whether there's legitimate purpose? The consent is required under the New York law for a personal guarantor, okay, because they are a consumer at that point. If it's an individual person, which it was here, they are required to get consent. Now, just addressing a couple of things that Brother Counsel said. His whole argument about RICO doesn't make any sense. Let's just say I run an illegal or I run an organization that is going to use legal purposes for a wrongful means. The thing about mail fraud and wire fraud, they themselves do not need to be fraudulent. They only have to be in furtherance of a fraudulent scheme. And that's what's very – But it's not a credit-connected mail fraud unless it's fraudulent. No, that's not true, Your Honor, respectfully. Okay. It has to be. If it's used in furtherance of a fraudulent scheme, it constitutes mail fraud or wire fraud. Now, to address Brother Counsel's assertion, number one – I guess this case is gone.  I mean – I mean, I suppose – I just want to make sure that there's – But coming back to that, how could a client – how could somebody who says that document is forged do possibly do anything other than say, I didn't sign that document? And to address whoever asked about the wet signature, that would at least make an argument that it wasn't cut and pasted, okay, which would – which really would substantially constrain – constrain. It's the client's perspective. I don't know how the signature got on there, but I believe it was cut and pasted from some other document. I don't know which one. Let's assume we agree with you that there's sufficient evidence from which a jury could infer that they didn't sign the documents, that there was some sort of cutting and pasting that happened. Is that enough from your perspective? Don't you also have to prove that the defendants knew? I think when the issue – yes. I think just the fact that it's forged by itself is not enough. That's why the predicate acts are mail fraud, wire fraud between the calls and whatever. And respectfully for the counsel, he himself put in an exhibit that showed how many times there were calls because they track all that. The suggestion that there were not calls, there was not mailing is just – it's pure fantasy. Okay. But somewhere you have to get fraud that's not just the contractors who are getting the – Correct. So what's your best – what are the three best pieces of evidence or even one best piece of evidence to show that the defendants in this case acted with a fraudulent intent? Okay. Here's the fraudulent intent. Just point me to the record. I'm telling you this is the scheme. Okay? No, I want you to point me to the record. I don't want the meta story about what happened. I want you to point me to the record to show the evidence that supports your meta story. I understand. Okay. When you take the testimony, the direct testimony of Joe Sussman, because Joe Sussman was the attorney who executed on 100 percent of these lawsuits. You take the testimony of Jay Cohen, okay, who's the mastermind behind the whole thing here, and you take the testimony of Sarah Krieger, they're the big three, okay, and they clearly set forth this pattern of practice of doing everything they can do to execute upon these contracts, even when there were questions of whether they were fraud or not, that even when somebody complained about fraud or forgery, they did not do any kind of an investigation. And is it your legal argument that that would be enough? I guess that's where I'm struggling, that they didn't sufficiently investigate once questions were raised. But then they verified the complaints. So when they sent out a verified complaint that says I have verified all the information that forms the basis of this complaint, when they say in there that on such and such a date, this person executed this lease agreement, but they don't know if that's true or not, and they don't do anything to verify the facts. Why isn't that just grossly negligent, reckless? Because they, because it is the design of the scheme. Once again, if you're looking at this at a onesie, twosie type basis, you might reach that. But when you start to see tens of thousands of times that this is happening, that's when it crosses the line. You can't just say it's negligence anymore. When you are consistently being made aware of that people did not sign the agreement, and you've learned. All the jury properly had before was the numbers, the 10,000. No, they had more than that. They knew that I was able to get testimony directly from Mr. Cohen and Ms. Krieger and Mr. Sussman that they were well aware that there were a large number of complaints that people were making to them about fraud and forgery in these documents. They were well aware of it. And particularly with the ISO, and, Your Honors, I'm sorry, I just can't remember which one. But particularly with one of the independent contractors involved, there was a longstanding history of complaints about that one contractor. I mean, it is just not conceivable. Even taking the document out, which I think should have come in, because where I disagree is the finding that this constituted fraud on the court, perhaps that shouldn't have come in. The finding that the conduct of these people, the very same people I just mentioned, constitute an environment of fraudulent activity. That absolutely should have come into the jury, because that is the exact question. That was before these people. And while you can argue whether my client were part of the 30,000 or not part of the 30,000, the scheme, as we call it, that applied, was the same scheme as what the New York Attorney General ruled upon. I mean, the last part of that ruling, not the New York Attorney General, the court, the judge, the last part of that ruling that this constitutes fraud on the court, okay. But all of the factual determinations that were made, they were the same exact factual determinations I tried to make. Okay. I think we have your argument in hand. Thank you very much. Thank you so much, Your Honors. We appreciate it. Both of you, appreciate your arguments. We'll take this under advisement.